<u>FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | Crim. No.: 17-277 (KSH) |
| v. | |
| PAUL MOE, *Defendant.* | <u>OPINION</u> |

## I.    Background

This matter comes before the Court on the emergent motion of defendant

Paul Moe seeking compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i).  As

summarized by the Third Circuit, Moe was convicted of wire fraud offenses based on

his submission of false time sheets:

> Paul Moe was convicted of wire fraud and conspiracy to commit wire
> fraud for submitting false time sheets to his employer. Moe's time sheets
> stated he had worked forty hours per week when, in fact, he had worked
> far less. Moe concedes that he was not present at his job forty hours per
> week. Instead, he argues that his time sheets were not materially false
> because, pursuant to contractual language, he was not actually required
> to fulfill the forty-hour requirement. . . .
>
> Moe worked for APM Terminals[1], a port and terminal operator, as a
> General Foreman. Pursuant to the terms of a collective bargaining
> agreement between his employer and his union, ILA Local 1804-1, which
> was amended in a 2013 Memorandum of Settlement (MOS), Moe
> qualified as an "Incumbent" and received his compensation in the form
> of a Special Package. Moe's Special Package compensated him twenty-
> four hours per day, seven days per week because he was on-call 24/7; the
> twenty-four hours were made up of eight hours of straight time, twelve
> hours of overtime, and four hours of double overtime, resulting in annual

---

[1] APM is described in the indictment as "a marine terminal operator that off loaded
containers from international cargo ships and moved the merchandise from Port
Elizabeth" – out of which it operated – "via rail and trucks."  (D.E. 1.)

compensation in excess of $400,000. The relevant provision of the MOS, for the purposes of this appeal, states that "incumbent" employees like Moe:

> will be assigned specific work tasks by their Employers, *will be required to be physically present* engaged in that work *when required by their Employers for a minimum of forty 40 hours per week*, and will be required to report to the terminals when required by their Employers. Employees not present at work when required will be subject to docking of pay and suspensions for repeated offenses.

*United States v. Moe*, 810 F. App'x 114, 116 (3d Cir. 2020).  As the panel explained, the "parties dispute[d] whether Moe was required to be physically present at APM's port for forty hours per week to qualify for his Special Package compensation," with Moe arguing that his contract required him to report only when directed by his employer and the government asserting that the contract and trial evidence showed that he had to be at work for at least 40 hours per week and had knowingly submitted false timesheets.  *Id.*

In October 2017, a jury convicted Moe of 13 counts of wire fraud under 18 U.S.C. § 1343 based on the submission of false time sheets for specific payroll periods, and one count of conspiracy to commit wire fraud under 18 U.S.C. § 1349. He was sentenced to a custodial term of 24 months on March 26, 2018, and remained on supervised release pending the outcome of his timely appeal.  On April 17, 2020, the Third Circuit affirmed his conviction.  There followed a series of extensions of his surrender date to FCI Fort Dix, where he was designated, spurred by the COVID-19 pandemic and its effect on Moe's documented health issues and age.  During that time period Moe also moved under 18 U.S.C. § 3582(c)(1)(A)(i),

asking the Court to convert his sentence to probation with home confinement rather than require him to report to Fort Dix.  The Court denied relief in an oral opinion (D.E. 114), supplemented by a written opinion issued on June 9, 2021 (D.E. 115), in which it concluded that it could not address the merits of Moe's motion before he began serving his sentence.  Moe surrendered on August 16, 2021, and is currently housed in the minimum-security camp at FCI Fort Dix.  He was fully vaccinated with the Moderna COVID-19 vaccine prior to his surrender, and the medical records submitted to the Court reflect that he reported to prison medical staff that he tested positive for COVID-19 in January 2021.

Moe has renewed his motion for compassionate release (D.E. 117), the government has opposed (D.E. 122), and Moe has filed a reply (D.E. 123), with both sides filing exhibits in support.

## II.   Discussion

The law governing Moe's application for COVID-19 related compassionate release has become familiar and remains relevant notwithstanding the medical advances against the pandemic in effect now, particularly the development of safe and effective vaccines.  Since the passage of the First Step Act in December 2018, sentenced offenders seeking an early release from custody may apply directly to the sentencing court for relief under specified circumstances:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and

3

may impose a term of probation or supervised release with or without
conditions that does not exceed the unserved portion of the original term
of imprisonment), after considering the factors set forth in [18 U.S.C.]
section 3553(a) to the extent that they are applicable, if it finds that—

(i) extraordinary and compelling reasons warrant such a reduction;

. . .

and that such a reduction is consistent with applicable policy statements
issued by the Sentencing Commission . . .

18 U.S.C. § 3582(c)(1)(A)(i).

Before the First Step Act, only the BOP, not prisoners themselves, could file
compassionate release motions; the Act changed that, but retained a role for the
BOP in the form of an administrative exhaustion requirement. *See* First Step Act
of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; 18 U.S.C.
§ 3582(c)(1)(A); *see also United States v. Andrews*, 12 F.4th 255, 257-58 (3d Cir.
2021). Before filing a motion with the sentencing court, the defendant must fully
exhaust administrative remedies within the BOP or wait 30 days from the date the
facility's warden receives defendant's request, whichever happens first. *See* 18
U.S.C. § 3582(c)(1)(A); *see also United States v. Harris*, 973 F.3d 170, 171 (3d Cir.
2020). On August 20, 2021, Moe, through counsel, requested that the BOP move for
compassionate release on his behalf. (D.E. 117-3, Def. Ex. A.)[2] He filed the motion
before this Court on September 23, 2021, more than 30 days later. The motion is
properly before the Court.

---

[2] The BOP subsequently requested, and Moe's counsel provided, additional
information in support of his request for relief. (D.E. 117-4 & 117-5, Def. Exs. E, F.)

Substantively, the statute permits compassionate release if (1) extraordinary and compelling reasons permit the requested reduction in sentence; (2) the reduction is consistent with applicable policy statements by the U.S. Sentencing Commission; and (3) consideration of the applicable sentencing factors in 18 U.S.C. § 3553(a) supports the relief sought.  18 U.S.C. § 3582(c)(1)(A).  As explained below, the relevant policy statement aids in defining "extraordinary and compelling reasons"; as such, the first two requirements will be addressed together, followed by the § 3553(a) factors.

### 1. Extraordinary and Compelling Reasons

Section 3582(c)(1) does not itself define the circumstances that qualify as "extraordinary and compelling."  The Court looks, therefore, primarily to the Sentencing Commission's policy statement at U.S.S.G. § 1B1.13, which was promulgated at Congressional direction in connection with the application of Section 3582.  28 U.S.C. § 994(a)(2)(C), (t).  Although the policy statement refers to motions brought by the BOP director, rather than directly by a defendant, making it not "applicable" within the meaning of 18 U.S.C. § 3582(c)(1)(A) and therefore not binding,[3] it remains an appropriate guide to the meaning of the "amorphous" "extraordinary and compelling reasons" language of the statute.  *Andrews*, 12 F.4th

---

[3] The Sentencing Commission is unable to update the policy statement because it lacks a quorum of voting members.  *See United States v. Brooker*, 976 F.3d 228, 234 (2d Cir. 2020).  Indeed, the affirmative vote of four members is needed to amend guidelines, but on October 31, 2021, the term of its one remaining Commissioner expired.  *See* United States Sentencing Commission, *Organization*, https://www.ussc.gov/about/who-we-are/organization (last visited November 12, 2021).

at 260; *accord United States v. Jefferson*, 2021 WL 4279626, at *2 (3d Cir. Sept. 21, 2021) ("[I]t is not error for a district court to consider the policy statement in its 'extraordinary and compelling' analysis, even if the policy statement is not ultimately binding on the court.").

The commentary to the policy statement provides, in relevant part, that extraordinary and compelling reasons exist where the defendant is:

> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S. Sent'g Guidelines Manual § 1B1.13 cmt. n.1(A)(ii). (U.S. Sent'g Comm'n 2018).[4]

Moe cites several medical conditions as warranting the conclusion that in light of the COVID-19 pandemic, extraordinary and compelling reasons exist for his requested reduction in sentence. The government counters, however, that Moe's

---

[4] The commentary also provides that "extraordinary and compelling reasons" exist based on a defendant's terminal illness; age, where, *inter alia*, he has served at least 10 years or 75% of his term of imprisonment; and in specified family circumstances. *Id.* § 1B1.13 cmt. n.1(A)(i), (B), (C). There is no argument that any of these circumstances apply. Nor has Moe invoked the catchall category: that "[a]s determined by the Director of the [BOP], there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.* § 1B1.13 cmt. n.1(D). To the contrary, he argues that the view of the BOP does not constrain the Court's discretion. (D.E. 117-1, Moving Br. 13-16.)

vaccinated status takes a finding of "extraordinary and compelling circumstances" off the table altogether: "[F]or inoculated inmates . . . the risks of COVID-19 now are removed from a proper § 3582(c) analysis." (D.E. 122, Opp. Br. 3). And, "[s]imply put, for fully-vaccinated inmates, chronic, age-related ailments are the types of conditions otherwise commonly addressed in the prison setting and neither extraordinary nor compelling." (*Id.* at 13.) For the broad rule the government proposes, it cites Judge Easterbrook's decision in *United States v. Ugbah*, 4 F.4th 595 (7th Cir. 2021), which the Court has reviewed along with Judge Easterbrook's decision in *United States v. Broadfield*, 5 F.4th 801 (7th Cir. 2021), issued the same day.

It would appear accurate that the Seventh Circuit has held that "prisoners who have access to a vaccine cannot use the risk of COVID-19 to obtain compassionate release," insofar as the prisoner has not shown an inability to receive or benefit from the vaccine. *Ugbah*, 4 F.4th at 597 (citing *Broadfield*, 5 F.4th 801); *see also Broadfield*, 5 F.4th at 803 (prisoner who can demonstrate that he cannot receive or benefit from vaccine may still seek relief under compassionate release statute, but "for the vast majority of prisoners, the availability of a vaccine makes it impossible to conclude that the risk of COVID-19 is an 'extraordinary and compelling' reason for immediate release").

The government suggests that courts within this circuit have followed the same path. (*See* Opp. Br. 12-13 (citing cases).) The Court is persuaded that none of the cited decisions states that vaccination renders the risk of COVID-19

nonexistent.  Instead, they concluded that the risks posed by the virus are reduced

if the defendant is vaccinated and that on the specific facts of record, the defendants

had not met the "extraordinary and compelling" standard.  In *Edmonds*, the

defendant's vaccination meant that "he is no longer particularly vulnerable to

COVID-19," and there was "nothing before the Court to suggest that [his] medical

conditions [were] not being addressed."  *United States v. Edmonds*, 2021 WL

1561848, at *2 (D.N.J. Apr. 21, 2021) (Bumb, J.).

In *Turbides-Pena*, the risk of illness from COVID-19 based on the defendant's

medical condition was "substantially reduced" by his vaccination against the virus.

*United States v. Turbides-Pena*, 2021 WL 2310093, at *3 (D.N.J. June 7, 2021)

(Chesler, J.).  *Accord Jefferson*, 2021 WL 4279626, at *2 (affirming denial of relief

because defendant, who was vaccinated and previously had COVID-19, had not

shown "that he is at a greater risk of infection or that FCI Allenwood places him at

a heightened risk," particularly given "the high rates of vaccination among the

inmate population and the staff at FCI-Allenwood").

In *Hannigan*, the court accepted that the defendant's "risk of severe outcome

from COVID-19 ha[d] been reduced by the Moderna vaccine."  *United States v.*

*Hannigan*, 2021 WL 1599707, at *1 (E.D. Pa. Apr. 22, 2021).  The court in *Watkins*

likewise agreed that "the administration of an effective COVID-19 vaccine lessens"

– not eliminates – "the risk of serious illness or death from a COVID-19 infection."

*United States v. Watkins*, 2021 WL 1627765, at *2 (W.D. Pa. Apr. 27, 2021).  *See*

*also United States v. Rhodes*, 2021 WL 4460031, at *5-6 (W.D. Pa. Sept. 29, 2021)

(vaccinated inmate with likely prior infection failed to show extraordinary and compelling circumstances "[o]n this record" because his risk of reinfection and, if reinfected, suffering severe illness, were "speculative because of his vaccination" and he had not shown that he "continues to face a substantial risk from the COVID-19 virus" when he offered only attorney argument and not evidence).[5]

*Hannigan* illustrates the case law's fact-specific approach to risk post-vaccination. While recognizing that the vaccine reduced the defendant's risk of serious illness or death from a COVID-19 infection to such a degree that his health problems were no longer "sufficiently extraordinary and compelling to warrant compassionate release," the court also acknowledged that "the COVID-19 situation is always-changing and . . . it is unclear how emerging variants will alter vaccine efficacy over time." *Hannigan*, 2021 WL 1599707, at *5. Similarly, *Watkins* acknowledged the fluidity of the situation in denying relief:

> As have other courts, I recognize that the "COVID-19 situation is always-changing and that it is unclear how emerging COVID-19 variants will alter vaccine efficacy over time." *Hannigan*, 2021 WL 1599707 at *5. As of now, however, the CDC indicates that the Defendant has significant protection against serious illness due to his vaccination. Consequently, I find that the Defendant has not demonstrated extraordinary and compelling reasons for release and I

---

[5] The government also twice cites this Court's opinion in *United States v. Latham*, 2021 WL 1171634, at *4 (D.N.J. Mar. 29, 2021), in particular its reference to the "great strides in vaccine development and rollout" since that defendant's prior compassionate release motion was filed, and the availability of three vaccines that had "proven highly effective at preventing COVID-19 illness in those who have been fully inoculated." (Opp. Br. 4, 12.) But it omits that Latham was denied relief based on the § 3553(a) factors, not an absence of extraordinary and compelling circumstances. Indeed, the Court specifically pointed to "the uncertain data and mix of cases going both ways on the issue of reinfection" in declining to conclude that he was no longer at risk of serious illness from the virus. *See id.* at *4-5.

> need not continue in my analysis. If the scientific information on the
> protection offered by vaccinations changes, the Defendant is free to file
> a renewed Motion. Because he cannot demonstrate extraordinary and
> compelling reasons supporting release at this time, the Motion is denied.

*Watkins*, 2021 WL 1627765, at *2.  Likewise in *Jefferson*, in which the Third

Circuit affirmed the denial of relief to a vaccinated, previously-infected defendant

because he had not shown that he, personally or at the particular institution of

confinement, was at an increased risk of infection and the general existence of

COVID-19 was insufficiently specific.  2021 WL 4279626, at *2.  The panel did,

however, acknowledge that defendant's "fears of reinfection are not completely

unfounded, considering the multitude of unknowns that the Coronavirus pandemic

has unleashed." *Id.*

The government's proposed approach reads the nuances and qualifying

language out of the foregoing cases.  Undoubtedly, vaccination is a significant

consideration, and in some circumstances where a defendant refuses to get

vaccinated, it may effectively be dispositive.  But the decisional law also accounts

for situations in which a defendant establishes that he or she remains at risk

notwithstanding vaccination.  Here, Moe has shown that he remains particularly

vulnerable to COVID-19, notwithstanding his vaccination and prior infection.

Along with his age, 70, and obesity, both of which place him at increased risk and

may decrease the efficacy of the vaccine (*See* Moving Br. 18-20; Centers for Disease

Control and Prevention, *People with Certain Medical Conditions*,

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-

medical-conditions.html (last visited Nov. 12, 2021); *United States v. Sawyer*, 2021

WL 3051985, at *2 (E.D.N.C. June 15, 2021) (citing "[g]uidance . . . warn[ing] that

the COVID-19 vaccine may not be effective, or is less effective, on individuals with

obesity"); *accord United States v. Bozon Pappa*, 2021 WL 1439714, at *4 n.4 (S.D.

Fla. Apr. 1, 2021)),[6] Moe cites his considerable ongoing, chronic medical problems,

including diabetes, for which he must take insulin and oral medication twice daily,

chronic obstructive pulmonary disease (COPD), severe sleep apnea for which he is

prescribed a CPAP machine, hypertension, obesity, and chronic fatigue.[7]  For at

least several weeks after he reported to FCI Fort Dix, he was not given access to

multiple medications and his CPAP machine, and if he is required to return to

quarantine, he will again be deprived of his CPAP machine.  (Moving Br. 4-5; D.E.

117-14, Def. Ex. G; D.E. 117-16, Def. Ex. I; D.E. 122-6, Gov't Ex. A, Sealed Medical

Records at 001, 002; D.E. 123-1, Ex. 1 to Reply ("BOP guidance does not permit

inmates to utilize CPAP machines while in quarantine due to COVID-19

restrictions.").)  This deprivation of his ability while incarcerated to employ the

prescribed medication and strategies for managing his serious, chronic conditions

---

[6] Moe also notes that he has not yet received a booster shot.  (Moving Br. 6.)  Citing
emerging evidence suggesting that vaccine efficacy is decreasing over time, the CDC
recommends that persons of Moe's age receive a booster shot beginning 6 months
after receiving a second vaccine shot; in Moe's case, that means beginning in late
November 2021.  (*See* D.E. 122-6, Gov't Ex. A, Sealed Med. Records at 022; CDC,
*COVID-19 Vaccine Booster Shots*, https://www.cdc.gov/coronavirus/2019-
ncov/vaccines/booster-shot.html (last visited November 12, 2021) (page last updated
November 9, 2021).)
[7] He also cites conditions he has developed since sentencing, including "(1)
Recurring bronchitis with wheezing and bronchospasms which require an inhaler;
(2) Acid Reflux; (3) Hypothyroidism; (4) Prostatic Enlargement; and (5) Vitamin D
Deficiency."  (Moving Br. 4.)

substantially deprives him of the ability to care for himself, both in the normal course and in particular in the event of a lockdown or quarantine.  Nor is there any indication that his medical conditions will resolve; to contrary, his diabetes, in particular, has worsened since he was sentenced in 2018.  (D.E. 117-15, Def. Ex. C.)

Moreover, FCI Fort Dix reports seven current inmate cases of COVID-19 infection (the fourth highest in the country among BOP facilities) and five current staff cases – up from zero inmate cases and five staff cases as of September 23, 2021, when Moe filed his moving brief.  (BOP, *COVID-19 Cases*, https://www.bop.gov/coronavirus/) (last visited November 12, 2021); Moving Br. 10.) Moe's application does not, in other words, rest on "the mere existence of COVID-19 in society and the possibility that it may spread to [the] particular prison" in which he is confined.  *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).  Inmate infections have in fact returned to FCI Fort Dix, which also reports the highest number of historical infections across all BOP facilities.  (BOP, *COVID-19 Cases*, https://www.bop.gov/coronavirus/) (last visited November 12, 2021) (reporting 1,623 "recovered" inmates; the next highest facility reports 1,037 "recovered" inmates).) The institutional disruptions to his receipt of necessary medications and therapies, his high-risk condition to begin with (which is mitigated, but not eliminated, by his vaccinated, COVID-recovered status), and the prospect that he would be again deprived of a CPAP machine in the event of an exposure to COVID-19 (perversely, at a time when he would presumably most need it), combined with the now-

increased risk posed by the conditions at FCI Fort Dix, amount to an "extraordinary and compelling" reason for the Court to consider a reduction in sentence.[8]

Dictionary definitions of "extraordinary" and "compelling," as applied here, buttress this conclusion.  As summarized in *United States v. Somerville*, which concluded that relief was appropriate under the circumstances:

> The word "extraordinary" is commonly understood to mean "going beyond what is usual, regular, or customary," or "exceptional to a very marked extent." *Extraordinary*, Merriam-Webster Dictionary (2020); *see also Extraordinary*, Black's Law Dictionary (11th ed. 2019) ("Beyond what is usual, customary, regular, or common."). The word "compelling" means "forceful," "demanding attention," or "convincing." *Compelling*, Merriam-Webster Dictionary (2020); *see also Compelling Need*, Black's Law Dictionary (11th ed. 2019) ("A need so great that irreparable harm or injustice would result if it is not met."). Thus, at a minimum, § 3582(c)(1)(A)(i) requires a justification for release that is both ***unusual*** (*i.e.*, unique to the inmate, and beyond the ordinary hardship of prison) and ***significant*** (*i.e.*, serious enough to make release appropriate).

*United States v. Somerville*, 463 F. Supp. 3d 585, 595-96 (W.D. Pa. 2020).  *Accord Andrews*, 12 F.4th at 260 (appropriate for district court to consult dictionary definitions to assist in defining "extraordinary and compelling reasons").  Moe's conditions extend beyond the "chronic, age-related ailments . . . commonly addressed in the prison setting."  (Opp. Br. 13.)  As explained above, in addition to

---

[8] Also of note is the disparity in vaccination rate between Fort Dix, which the government reports to be approximately 65% (Opp. Br. 13 n.13), and the rate at which New Jersey's adult population (ages 18 and older) is fully vaccinated, currently 79.5% as reported by the CDC.  (*See* CDC, *COVID-19 Vaccinations in the United States*, https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-people-fully-percent-pop18 (last visited November 12, 2021).)  Updating the government's methodology with current vaccination data from the BOP, there are 3,190 total inmates at Fort Dix (both the FCI and satellite camp) and 2,073 inmates have been fully inoculated, resulting in a vaccination rate of 65%.  (BOP, *COVID-19 Vaccine Implementation*, https://www.bop.gov/coronavirus/ (last visited November 12, 2021).)

his age, he has a constellation of chronic, worsening medical conditions requiring specific, ongoing, consistent treatments; he experienced a disruption as to at least some of those treatments and there is a real risk that he will be deprived of at least one of them in the future; and his personal risk is compounded by the conditions specific to FCI Fort Dix and its past and current issues in controlling the virus. On this record, Moe's circumstances extend beyond the typical hardships of prison for every inmate, and he has gone beyond pointing to a general concern about congregate living and adduced evidence that provision of his layered, multiple therapies is not guaranteed.

The cases in this Circuit accept that vaccines, and potentially prior infection, reduce risk, but they assuredly do not stand for the proposition that no risk remains for vaccinated inmates. On this record and having considered that authority, the Court finds that Moe has established extraordinary and compelling circumstances that make him eligible for relief, if he can also show that the § 3553(a) factors also favor that course.

### 2. Section 3553(a) Analysis

The finding that Moe is preliminarily eligible for relief based on a showing of extraordinary and compelling reasons thrusts front and center the sentencing factors in 18 U.S.C. § 3553(a), whereby a court must impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing, including the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the

offense," afford adequate deterrence, protect the public from additional crimes by the defendant, and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2)(A)-(D).  The court must also consider the "nature and circumstances of the offense and the history and characteristics of the defendant" and the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," among other factors.  *Id.* § 3553(a)(1), (6).

Moe argues that prior to the offense underlying his current sentence, which was itself a non-violent financial crime, he led a law-abiding life with no history of violence and has had, and will have if released, the strong support of his family, with no risk of recidivism.  (Moving Br. 21.)  The government's primary argument in response – and indeed the centerpiece of its opposition, which is entitled "Opposition to Eliminating Well Over 90% of Moe's Entire Sentence" – is that Moe has served too little of his term of imprisonment to qualify for release under § 3582(c)(1)(A).  The government further argues that none of the § 3553(a) factors favors relief, and argues also that Moe's failure to disclose in his moving papers that he had recovered from a COVID-19 infection early in 2021 signals a risk of recidivism.

Examining the § 3553(a) factors, those that are not, or are only minimally, applicable in this case are adequate deterrence, protection of the public, and the need to avoid unwarranted sentence disparities.  Briefly, the prosecution of Moe in

15

itself was the deterrent event; as is clear from the Third Circuit's description of the case against him, the focal point was the contract providing him a generous salary, and "the parties' dispute" was over contract terms.  As the affirmance recognized, Moe conceded he took that salary and argued the contract terms supported his receipt of it.  That an employee who interpreted the contract as Moe did could be sent to prison constituted general deterrence with the clear signal to others who might find themselves with a similar employment arrangement.  As to specific deterrence, Moe himself is never going to be in a position to recidivate.  To the extent that his interpretation of the special package was deemed criminal and that and Moe (as well as others) will never again receive it, the public is fully protected.

Proportionality concerns do not factor in: the extent of legal argument before and after the trial about whether Moe's actions were criminal at all is testament to the specificity and *sui generis* nature of the crime.[9]  The goals of appropriate designation and rehabilitation in § 3553(a)(2)(D) (provision of "needed educational or vocational training, medical care, or other correctional treatment in the most effective manner") are considerations in fashioning the sentence, but do not feature in a compassionate release analysis.  The crux, then, of the Court's analysis is on the need for the sentence to "reflect the seriousness of the offense, to promote

---

[9] In fact, the government's proportionality argument turns on the false premise that because Moe and others convicted of fraud offenses are seeking compassionate release, granting his application when others are denied offends proportionality. (*See* Opp. Br. 20-21.)  This ignores the very specificity of the proportionality requirement, which examines the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

respect for the law, and to provide just punishment for the offense," all the while considering the history and characteristics of the defendant and the nature and circumstances of the offense.

In short, in Moe's case the Court must ask if release from custody now punishes him enough for having done what he did,[10] and how his personal characteristics and history bear on that.  Not unlike its proffered argument, rejected above, that a bright-line rule exists that vaccinated prisoners cannot prove eligibility for compassionate release on COVID grounds, the government proposes that a request for sentence reduction must be denied when a defendant "has served less than 10% of the sentence [the Court] deemed appropriate."  (Opp. Br. 24.)  Its marquee case in support is *United States v. Pawlowski,* 967 F.3d 327, 328 (3d Cir. 2020), which involved a defendant convicted of bribery, attempted extortion, wire and mail fraud, honest services fraud, making false statements to the FBI, and conspiracy, based on "a scheme in which he—then the mayor of Allentown, Pennsylvania—steered city contracts and provided other favors in exchange for campaign contributions."

A reading of *Pawlowski* shows that the decision does *not* stand for the broad principle that the amount of time remaining on a sentence must or should control the consideration of the applicable § 3553(a) factors.  Instead, the panel held that it is not an abuse of discretion for district courts to consider that information:

---

[10] The "seriousness of the offense" in § 3553(a)(2)(A) and the need to consider the "nature and circumstances of the offense" in § 3553(a)(1) for purposes of this analysis merge.

> Because a defendant's sentence reflects the sentencing judge's view of
> the § 3553(a) factors at the time of sentencing, the time remaining in
> that sentence *may—along with the circumstances underlying the
> motion for compassionate release and the need to avoid unwarranted
> disparities among similarly situated inmates—inform* whether
> immediate release would be consistent with those factors.

*Id.* at 331 (emphasis added).  In other words, the time remaining is one

consideration courts may properly look to, along with the overall circumstances

undergirding the motion and the need to avoid unwarranted disparities.  As such,

the panel declined to conclude "that the District Court acted unreasonably in

determining that the substantial sentencing reduction required for granting

compassionate release here—a reduction from 15 years to less than two years—

would be inconsistent with the § 3553(a) factors."  *Id.*

    The government represents that "[s]ubsequent opinions routinely apply

*Pawlowski* to support denying § 3582(c)(1) motions when there is substantial time

remaining to be served."  (Opp. Br. 17.)  Courts do indeed take this information into

account, but, consistent with *Pawlowski* itself, they do not elevate that factor to

dispositive status.  Via a cross-reference to its reply brief opposing Moe's first

compassionate release motion, the government cites four unpublished Third Circuit

decisions; in all of those cases, the amount of time remaining was one factor of

many supporting the denial of relief.  *United States v. Vaquiz*, 846 F. App'x 85, 85-

86 (3d Cir. 2021) (affirming where district court considered length of time already

served, the risks to others posed by defendant's drug distribution offenses, and

lengthy criminal history); *United States v. Williams*, 844 F. App'x 485, 486 (3d Cir.

2021) ("The District Court acted within its discretion to deny relief based, in part,

on the substantial time remaining to be served on Williams' sentence, the seriousness of his offense of conviction, and his extensive criminal history." (citing *Pawlowski*, 967 F.3d at 331)); *United States v. Sabot*, 845 F. App'x 101, 103 (3d Cir. 2021) (affirming where district court considered defendant's "lengthy and serious criminal history," that instant offense was committed while he was on probation, and length of time remaining in sentence); *United States v. Hogan*, 852 F. App'x 634, 637 (3d Cir. 2021) (district court examined defendant's lengthy criminal history, "high risk of recidivism," the need for a substantial sentence for rehabilitative purposes, below-Guidelines sentence, and amount of time remaining).[11]

The same approach is evident in *United States v. King*, 2021 WL 3783157 (D.N.J. Aug. 24, 2021) (Vazquez, J.), which the government represents as having "summed up the law since *Pawlowski* this way: Whenever a defendant has served 'less than half his sentence,' that 'militates against release.'" (Opp. Br. 17.) *King* contains no such broad statement; nor does it so imply. After concluding that the defendant, who refused vaccination and offered only limited support for his purported medical conditions, had failed to show extraordinary and compelling

---

[11] The more recent Third Circuit decisions in the government's opposition brief follow the same path. (Opp. Br. 18.) *See United States v. Hicks*, 2021 WL 4316829, at *2 (3d Cir. Sept. 23, 2021) ("The District Court was well within its discretion when it determined that Hicks's criminal history, the seriousness of his crime, and the time remaining on his sentence weighed against his receiving compassionate release."); *United States v. Harper*, 2021 WL 3612151, at *2 (3d Cir. Aug. 16, 2021) (per curiam) (citing time remaining as one of multiple considerations); *United States v. Brown*, 2021 WL 3356946, at *2 (3d Cir. Aug. 3, 2021) (per curiam) (same).

circumstances, Judge Vazquez concluded that the § 3553(a) factors likewise warranted denying relief.  At the end of this analysis, he wrote: "Finally, Defendant has served less than half his sentence, which also militates against release," followed by a lengthy excerpt from *Pawlowski*. *Id.* at *5.  Judge Vazquez did exactly what *Pawlowski* permits:  he considered the time served and the time remaining *among* the other necessary factors in reaching his decision to deny relief, and there is no language in his decision intimating he was "summing up" anything other than his own conclusion.  *Accord United States v. Farlow*, 2021 WL 1207485, at *3-4 (D.N.J. Mar. 30, 2021) (Chesler, J.) (noting the amount of time remaining on sentence as part of a broader examination under § 3553(a)).

At this point, Moe has served approximately three months of his 24-month term; a sizable percentage of his original sentence thus remains.  Nevertheless, his offense, while worthy of punishment, is magnitudes less severe than the conduct underlying the denials of relief in the many cases the government cites, which generally drew correspondingly lengthy sentences commensurate with that severity. *United States v. China*, 2021 WL 2472325 (D.N.J. June 16, 2021) (Salas, J.), involved heroin distribution charges that drew a 262-month sentence.  The drug offenses, which were also gang-related, in *United States v. Mann*, 2021 WL 1851902 (D.N.J. May 7, 2021) (Salas, J.), drew a 170-month sentence.  The defendant in *United States v. Obika*, 2021 WL 4326750, at *1 (S.D.N.Y. Sept. 22, 2021), drew a 33-month sentence for participating in an international money laundering conspiracy that involved $10 million in laundered proceeds; it "warranted a

significant period of incarceration and the Court imposed one." *United States v. Wragg*, 2021 WL 4459455 (3d Cir. Sept. 29, 2021), involved the leader of a $54 million fraud scheme who, while on pretrial release, engaged in additional fraudulent conduct and drew a 22-year sentence. *United States v. Dunich-Kolb*, 2021 WL 6537386, at *10 (D.N.J. Nov. 5, 2020), involved a defendant who used "his position as a tax adviser to take advantage of clients and defraud the government, after a prior conviction and even while on bail supervision in this case." As described by Judge McNulty:

> Dunich-Kolb's criminal conduct was serious, deliberate and ongoing. It followed a conviction and service of a state sentence for a tax-related offense. It was accomplished through the defendant's falsely holding himself out as a CPA, in violation of a consent order. It included egregious acts of tax fraud involving the preparation of false returns for clients and himself. It involved fraud against clients, in that he filed fraudulent returns on their behalf and pocketed the refunds. In one instance, it entailed aggravated identity theft with respect to a deceased client. Part of the criminal conduct occurred while Dunich-Kolb was on bail supervision, which, after a failed cover-up, resulted in revocation of bail. The aggregate loss exceeded $2.2 million.

*Id.* The court squarely measured the criminality of what Dunich-Kolb had done against the length of time he had served, and denied compassionate release because "in my view, he has not served an amount that would adequately address the seriousness of the offense or serve the goals of punishment and deterrence." *Id.*

*United States v. Wilson,* 2021 WL 4453599 involved a short sentence – six months – imposed after Wilson pleaded guilty to filing a false tax return. While *Wilson* comes the closest to Moe's in some particulars, the underlying crime involved intentional acts of embezzlement, stealing $1 million from his employer.

The tax return he filed was false because it failed to reflect the embezzled funds. The court was unmoved by Wilson's medical arguments, finding the infection rate at Devens to be low and his medical condition to be the same as it was when he was sentenced.  Moreover, the sentence reduction of four months, the court reasoned, failed to adequately punish him.

> Mr. Wilson pleaded guilty to filing a false tax return, in violation of 26 U.S.C. § 7206. This is a serious crime that carries a sentence of up to three years imprisonment. Releasing Mr. Wilson after serving a third of his sentence would fail to reflect the seriousness of his offense, promote respect for the law, or provide just punishment. Such a dramatic departure from the recommended sentence would also not afford adequate deterrence to similar criminal conduct. Also, a four-month sentence for a crime that typically carries a sentence of eighteen to twenty-four months would create a significant sentence disparity among defendants with similar records who have been found guilty of similar conduct.

*Id.* at *3.

The Court is satisfied that the animating thought behind these and similar decisions that denied relief is the egregiousness of the underlying conduct and how that criminality militated against immediate release even in cases where the medical evidence was serious.[12]  Moe's offense of conviction stands in sharp contrast

---

[12] Any sensible reading of the jurisprudence must respect the difficulty of making a decision that the bad acts of a particular criminal defendant require continued punishment, notwithstanding the risk to the defendant's health in view of the pandemic.  None of the decisions the Court has been asked to review by Moe or the government takes the easy way out and concludes that mathematically or formulaically the defendant does not deserve release because of the amount of time served or left to serve.  As one thoughtful judge has observed, "A categorical or even near-categorical bar on granting compassionate release to inmates who have not served a particular percentage of their sentence fails to appreciate the extraordinary danger that COVID-19 poses to medically vulnerable inmates." *Somerville*, 463 F. Supp. 3d at 605.

to the crimes described above.  He continued a practice that pre-dated the contract change in 2013 and interpreted his "incumbent" status as freeing him from what that change imposed.  This was foolish, and as his prosecution and conviction make clear, wrong.  But one is hard pressed to elevate the time left on his sentence as putting significant weight on the scale where "seriousness of the offense" is concerned.

As to the companion factors – "just punishment" and "promot[ing] respect for the law," again, Moe's felony conviction per se accomplishes the latter.  To the extent that the public's respect for the law may be affected by immediate release on medical grounds, the Court does not believe that requiring a sick man in his 70s to serve out his sentence offends the principles behind this factor.  This leaves "just punishment."

Paul Moe's immediate release satisfies the sentencing purpose of just punishment.  His emergent application, as discussed above, establishes compelling and extraordinary circumstances warranting compassionate release, and the other applicable § 3553(a) factors do not disfavor him.  Just punishment must be measured in terms of the parsimony clause, that the sentence imposed be "sufficient but not more than necessary."  This begs the question of whether there is additional punishment in requiring Moe to complete his sentence given the considerable risk to his health – which is living daily with that risk.  Assuming this is a legitimate question, which the Court believes it is, the answer is in the affirmative.  The Court concludes that for this man, having committed this crime, living daily with the

23

"extraordinary danger that COVID-19 poses to medically vulnerable inmates," *Somerville*, 463 F. Supp. 3d at 605, further incarceration is punishment purely for punishment's sake, and his crime of conviction does not warrant such measures.

The policy statement at U.S.S.G. § 1B1.13 includes a requirement that the defendant not be a danger to the safety of any other person or to the community, pursuant to 18 U.S.C. § 3142(g).  Courts in this district have included this as a factor for consideration in the compassionate release analysis.  *See, e.g.*, *Mann*, 2021 WL 1851902, at *6.  It is unclear whether that remains necessary after *Andrews*, 12 F.4th 255.  Assuming it does, § 3142(g) looks to the nature and circumstances of the offense, the weight of evidence (which does not apply, given Moe was already convicted), the person's history and characteristics, and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

Applicable to this consideration, the government asks the Court to consider Moe's failure to reveal in his moving briefs the fact of his COVID-19 infection in January 2021, which he disclosed to the BOP upon his surrender, arguing "[h]is failure to disclose that material fact is itself recidivation."  (Opp. Br. 22.)  That is an argument that, quite simply, does not persuade.  Moe's arguments, on the other hand, have merit:  prior to his offense he has led a law-abiding life; the offense was non-violent; his family continues to offer as he describes it, "unrelenting love and emotional support" and if released, he would live, as he had before his conviction, with his daughter in New Jersey where his medical needs could be attended to.

(Moving Br. 21.)  That showing favors release when the Court addresses the remaining requirement that it consider "the history and characteristics of the defendant"; the lengthy discussion above about his offense of conviction satisfies the companion requirement that the Court consider the "nature and circumstances of the offense" and again, favors immediate release as an appropriate response to his medical needs.

### III.      Conclusion

For the foregoing reasons, Paul Moe's emergent motion for compassionate release is granted.  An appropriate order is filed herewith that provides for a sentence of time served and a three-year term of supervised release, the conditions of which remain unchanged from those imposed when he was sentenced.

Dated:  November 12, 2021                    /s/ Katharine S. Hayden
                                             Katharine S. Hayden, U.S.D.J.